*Per Curiam.

It will be observed that this is the case of a special verdict, and the court can intend nothing but what is found by the jury.[1] This remark is an answer to much of the reasoning on both si lies, *93 and narrows the grounds of discussion to the following points:
1st. Whether the vessel and cargo, although literally American, according to the implied warranty in the policy had forfeited the privilege of that character, by accepting the protection of a passport from one of the belligerent nations ?
2d. Whether the purchase of the cargo in a French port was within the prohibition of the act of Congress of the 13th June, 1798, and an illegal trade?
As to the first, it appears that the Haney sailed with the usual documents of an American vessel, and was in every respect entitled to be considered as such, unless the French passport which she received at St: Domingo would deprive her of that privilege. The general rule by which to determine the national character of a vessel is the domicil of the owner. In the present case the owners resided in the state of Ehode Island. We admit the exception to this rule where the vessel navigates under the flag or assumed character of a country to which she does not belong; but the instance before us, we apprehend, is not the case of a vessel sailing under that protection, or, as it is termed by Sir William Scott, under the pass of a different nation; her papers were all American, except the one in question; she was in fact American, if we believe the verdict, and she professed no other than the American character. The additional paper which she received on board at the Cape, according to its import, was not inconsistent with that character ;(a) on the contrary, she was therein stated to be the property of Mr. Jenks, merchant at Providence, state of Ehode Island; that paper, accompanied with the other documents she possessed, could not be evidence of her being French property, or employed as a French vessel; she had come from a French port, and was destined to a Dutch Island, both of which were lawful; and it was natural, and. *94 we believe is usual, in such cases, for vessels to seek for protection, and guard themselves against the cruisers of the power whose ports they have visited. This paper, unsupported by other evidence of belligerent property or employment, could be received in that light only. Con-[*65] nected with the fact that all ^intercourse had been prohibited by our government at that period with the French nation, we think it afforded a reasonable ground of suspicion that she was employed in the service of the French, and perhaps the risk was thereby enhanced; but, so far as that fact was material, the prohibition was known to the underwriters before they subscribed the policy, and they must have estimated the increased danger, if any, that resulted from it. Of itself, we think, it would afford an additional security against one of the belligerent parties, (the French,) and could not alone be a cause of capture, or sufficient to authorize a detention by any other belligerent. In practice, we believe it is customary for vessels to endeavor to protect themselves, by papers of this description from the public agents of every nation from which they can be obtained, and they have been considered as affording security, instead of endangering their neutrality.(a)
In determining the second question it is again neces sary to recur to the facts found by the verdict. From them it appears that the vessel was compelled to put into the Cape in distress; that when there the cargo was landed for the purpose of repairing her; that nearly all the provisions were taken by the French government, which prohibited relading any part of the cargo, and permitted to barter what was left for the produce of the island only, and to dispose of it in no other way; if this be true, they had no alternative but to comply with the terms prescribed, or sacrifice the whole of their property. Their acts were acts of necessity and coercion, and the law of congress which sus *95 pended the commercial intercourse with France and her dependencies, cannot reasonably be construed to apply to a case of this description; its object was to prevent an inten tional or voluntary traffic, and not to compel a sacrifice of property, or inflict a penalty in cases of distress or necessity That would be a construction excessively severe, and contrary to the spirit and intent of the act. On this point we understand a similar decision has been made in the district court of this state, which, on appeal, was affirmed by Judge Paterson in the Circuit Court of the United States. We are, therefore, of opinion, on both points, that the plaintiffs are entitled to recover, (a)
Judgment for the plaintiffs.

 Seward v. Jackson, 8 Cow. 406; Birckhead v. Brown, 5 Hill, 634

 Sue Blagge v. New York Ins. Co., post, 564.

 Therefore, a certificate of origin from a French consul, is no breach of the warranty of American property. Le Roy v. United Ins. Co., 7 Johns. Rep. 343.

 Judgment affirmed in the court of errors, (1 Caines’ Cas. in Error, 47,) end in the supreme court of the United States, (3 Cranch, 219.)